515 A.2d 1000

Commonwealth of Pennsylvania, Department of Corrections, State Correctional Institution at Muncy, Petitioner *v*. American Federation of State, County and Municipal Employees, Council 13, AFL-CIO, Respondent.

Argued September 11, 1986, before Judges CRAIG, COLINS and PALLADINO, sitting as a panel of three.

*Cheryl Young,* Assistant Counsel, for petitioner.

*Nancy B. G. Lassen, Kirschner, Walters & Willig,* for respondent.

OPINION BY JUDGE CRAIG, September 30, 1986:

Where a labor arbitrator's award requires a state correctional institution to make all prison guard shift assignments without regard to the gender of the prison guards and hence regardless of the personal privacy of

inmates in the presence of guards of the opposite sex, is the arbitrator's award invalid as not rationally derived from the essence of the provisions of the collective bargaining agreement relating to the prison's operation?

The Pennsylvania Department of Corrections has appealed from the award of a labor arbitrator upholding two grievances of corrections officers (guards) at the State Correctional Institution at Muncy, which houses approximately 400 female prisoners and 140 male prisoners and is the only state facility for female prisoners.

The grievances protested the failure of the employer to allow bids for shift preferences in accordance with Article 30, Section 10 of the agreement which states:

> In making shift assignments to shift openings, preference shall be granted on a seniority basis · unless the Employer feels it is necessary to assign otherwise in order to protect the efficiency of operation. Seniority status in this regard shall be Classification seniority attained at the work site.

The agreement further provides under Article 33, Discrimination:

> Both the Employer and the Union agree not to discriminate against any employee on the basis of race, creed, color, ancestry, sex, marital status, age, national origin, non-job related handicap or disability, union membership or political affiliation.

The arbitrator's findings of fact, which are not substantially in dispute in any respect, establish that the department's shift vacancy announcements at issue, posted in January and February of 1984, were labeled "C.O.I. VACANCY—FEMALE" and addressed to "All Female C.O.I.'s." After the department declined to permit male guards to bid on specific assignments, and af-

ter the rejection of the resulting grievances at initial steps, the parties submitted the grievances to the arbitrator.

The arbitrator found that the women prisoners live in eight large two-story housing units in two-person rooms, with a shower room on each floor, having two or three separate shower stalls; at least one recreational room is located in each women's building. Male prisoners reside in two single-story structures, each with a large open dormitory room, a shower room and a small recreation area.

Heretofore, the department staffed female housing units with female guards and male housing units by male guards. However, as the arbitrator found, since 1981 the department has had in effect for the prison a policy statement which declares that a guard's gender will not exclude the employee from employment nor from particular assignments except where sex is a bona fide occupational qualification. Summarized, specific policy guidelines state:

a. Guards will not be assigned to work in open view of unclothed inmates of the opposite sex;

b. External escort of prisoners must be by at least one officer of the same sex;

c. Assignments to housing units will involve at least one officer of the same sex as the inmates; and

d. Guards will not conduct strip or frisk searches of inmates of the opposite sex except in case of emergency.

Because of the express gender labeling of the shift bid announcements, the arbitrator correctly concluded that the grievants had established a *prima facie* case of sex discrimination. He acknowledged that, under the department's guidelines, both male and female officers

qualify for assignments on all shifts and may work with inmates of the opposite sex when more than one officer is present. He also correctly noted that the primary consideration is not whether men and women guards are eligible for several respective assignments in any shift, but rather the point is that men or women officers are being excluded from certain shift assignments on the basis of their gender.

The key issue, as the arbitrator stated it at the outset, was whether the distinction made by the department in the shift assignments was based upon a bona fide occupational qualification. Stated as a contract interpretation question, the issue is whether the department could depart from seniority as the sole criterion "in order to protect the efficiency of operation." Art. 30, sec. 10, quoted above.

The arbitrator acknowledged the decision of the United States Supreme Court in *Dothard v. Rawlinson,* 433 U.S. 321 (1977), in which the Court declined to invalidate a state regulation barring the hiring of women guards in contact positions at all-male prisons, concluding that gender was a bona fide occupational qualification in the circumstances of that case, which involved a danger of violence against women guards, threatening the control of the prison.

However, because the evidence in this case did not exhibit any special threat of violence against either male or female guards in this prison, the arbitrator decided that a guard's gender was not a bona fide occupational qualification, rejecting the department's position that personal privacy concerns of inmates, with respect to states of undress and the performance of intimate bodily functions in the presence of guards of the opposite sex, had a meaningful relationship to the selection of guards. The arbitrator found legal support—and apparently also a factual foundation—for that determination in *Griffin*

*v. Michigan Department of Corrections,* 30 Fair Empl. Prac. Cas. (BNA) 638 (E.D. Mich. 1982). In that case the U. S. District Court for the Eastern District of Michigan rejected the claim of the prison management defendants that inmate privacy is a factor creating a bona fide occupational qualification, stating:

> Defendants' argument is without merit because (1) it assumes that inmates retain an unqualified protected right of privacy under the Constitution, and (2) it is based on stereotypical sexual characterization that a viewing of an inmate while nude or performing bodily functions, by a member of the opposite sex, is intrinsically more odious than the viewing of a member of one's own sex. Neither assumption can withstand traditional scrutiny.
>
> . . . .
>
> Inmates do not possess any protected right under the Constitution against being viewed while naked by correctional officers of the opposite sex. The entire basis of the argument rests on assumptions and stereotypical sexual characteristics which have been expressly prohibited by Title VII, Dothard, supra, and other Supreme Court decisions that refute principals [sic] of sexual stereotyping.

30 Fair Empl. Prac. Cas. (BNA) at 646-48. Accordingly, the arbitrator here, in arriving at the award, stated his rationale as follows:

> Privacy rights of inmates is not a justification for a BFOQ exception to the general prohibition of discrimination on the basis of sex. It follows, therefore, that the Employer's attempt to draw a delicate balance between the inmates' rights of privacy and the employees' rights under the Agreement has no basis in law.

In so doing, the arbitrator departed from his own sound articulation of the issue, as noted above, and reached his conclusion on the basis of a different issue—balancing the rights of inmates against the rights of guards— which is not involved in the case. The interpretation issue for the arbitrator here was, as he initially recognized, whether the department had a basis for deeming it necessary to depart from seniority "in order to protect the efficiency of operation." With respect to resolving that issue, the arbitrator strayed from the essence of this contract and from the issue at hand, to import into the case the philosophical views of a federal trial court, whose position is neither binding nor necessarily persuasive with respect to the law of this Commonwealth. As this court has stated in an opinion by President Judge CRUMLISH:

> Laws forbidding discrimination in hiring on the basis of sex do not purport to erase all differences between the sexes. These laws recognize that there are jobs for which one sex is inherently and biologically more qualified than those of the opposite sex. The biological difference between men and women which in turn produce psychological differences are the facts that justify limiting personal contact under intimate circumstances to those of the same sex.

*Philadelphia v. Human Relations Commission,* 7 Pa. Commonwealth Ct. 500, 510 n.7, 300 A.2d 97, 103 n.7 (1973).

The essence of this contract involves the operation of a correctional institution having a legal responsibility as a public agency to deal with its inmate population effectively, efficiently and humanely. The essence of the contract being interpreted here is *not* to operate an institution which treats prisoners as if they were less than human, like inmates of a concentration camp, deprived

even of that minimal degree of personal privacy which the common opinion of civilized communities recognizes to be the entitlement of every person.

The irrationality of this award cannot withstand even the limited scope of review accorded to the appellate courts in these cases. In *Community College of Beaver County v. Community College of Beaver County Society of the Faculty,* 473 Pa. 576, 375 A.2d 1267 (1977), the Pennsylvania Supreme Court reiterated that an arbitrator's award is to be respected by the judiciary

> if 'the interpretation can in any rational way be derived from the agreement, viewed in light of its language, its context, and any other indicia of the parties' intention . . .' Ludwig Honold Mfg. Co. v. Fletcher, 405 F.2d 1123, 1129 (3rd Cir. 1969). It was this approach which was meant to be suggested by the brief statement in International Brotherhood of Firemen and Oilers, supra, that 'the arbitrator's interpretation of the contract must be upheld if it is a reasonable one.' 465 Pa. at 366, 350 A.2d at 809.

473 Pa. at 594, 375 A.2d at 1275.

In accordance with that equating of the rational derivation essence test with the reasonableness language of *International Brotherhood of Firemen and Oilers,* 465 Pa. 356, 350 A.2d 804 (1976), the Pennsylvania Supreme Court, in *Philadelphia Housing Authority v. Union of Security Officers No. 1,* 500 Pa. 213, 216, 455 A.2d 625, 627 (1983), overturned an arbitrator's award reinstating a housing authority security officer who had been discharged for defrauding an elderly tenant. Condemning the irrationality of condoning such conduct in relation to the essence of the collective bargaining agreement, the Supreme Court decided that

> it is manifestly unreasonable to conclude that the Housing Authority could have intended to bar-

gain away its absolute responsibility to insure the integrity of its housing security force by discharging an officer who has defrauded one of the very people whom he is paid to protect.

The Supreme Court thus concluded that the arbitrator was without authority to overturn the discharge because the arbitrator's decision was "unjustified by any terms that were or could properly have been contemplated by the parties. . . ." 500 Pa. at 216, 455 A.2d at 627.

Similarly here, it is manifestly unreasonable to conclude that prison management could have intended to bargain away its absolute responsibility to accord to prisoners such vestige of human status as is embodied in personal privacy.

The award of the arbitrator here, not being rationally derived from the essence of the contract and its purpose, must be vacated.

ORDER

Now, September 30, 1986, the arbitrator's award dated January 13, 1986, is vacated.