586 A.2d 355

**FRATERNAL ORDER OF POLICE, LODGE NO. 5 and Ronald Bojanowski, Appellants,**

v.

**CITY OF PHILADELPHIA.**

Supreme Court of Pennsylvania.

Argued Oct. 25, 1990.

Decided Jan. 7, 1991.

Reargument Denied May 9, 1991.

Anthony J. Molloy, Jr., Philadelphia, for appellants.

Ralph J. Teti, Philadelphia, for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, ZAPPALA, PAPADAKOS and CAPPY, JJ.

## ORDER

PER CURIAM:

Order affirmed.

McDERMOTT, J., did not participate in the consideration or decision of this case.

LARSEN, J., files a dissenting opinion in which CAPPY, J., joins.

CAPPY, J., files a dissenting opinion.

LARSEN, Justice, dissenting.

I dissent.

At issue here is the validity of a grievance arbitration award upholding the City of Philadelphia's discharge of a

police officer for allegedly using excessive force. The Court of Common Pleas of Philadelphia County denied the police officer's petition to vacate the award of the arbitrator, and the Commonwealth Court affirmed. I believe that the Commonwealth Court applied an incorrect standard of review in affirming the award of the arbitrator and would reverse its decision in this case.

Appellant, Ronald Bojanowski, a decorated 16-year veteran of the Philadelphia Police Department, was discharged on August 15, 1986 for violating the department's deadly force policy and for conduct unbecoming an officer. The specific charges, as set forth in the Notice of Dismissal, were as follows:

On or about 11:45 P.M., on Sunday, 5-26-86 on the highway at Livingston and Venango Streets, while off duty in civilian clothes [Bojanowski] did discharge [his] privately owned 45 caliber firearm at least six (6) times at a Brown Ford Granada owned and operated by a Mr. Trimbeck which was occupied by his wife Grace in the front passenger seat and their two (2) daughters Lena and Christine in the rear seat. [Bojanowski] did discharge [his] weapon at this vehicle as it was driving away from [him] and posing no danger to [his] safety or the safety of anyone else.

Appellant, Fraternal Order of Police, Lodge No. 5 (Union), filed a grievance on behalf of Bojanowski pursuant to the collective bargaining agreement in effect between appellee, City of Philadelphia (City), and the Union. Following three hearings, the arbitrator denied Bojanowski's grievance on April 24, 1986, concluding that the dismissal was consistent with the collective bargaining agreement, the Home Rule Charter and the Civil Service Regulations. Bojanowski and the Union petitioned the Court of Common Pleas to vacate the arbitrator's award, but the court denied their petition.

Subsequently, Bojanowski and the Union appealed to the Commonwealth Court. The court affirmed, relying on the narrow standard of review specified in *Lower Merion Fra-*

*ternal Order of Police, Lodge No. 28 v. Township of Lower Merion,* 511 Pa. 186, 512 A.2d 612 (1986). In *Lower Merion Fraternal Order of Police,* this Court stated that review of an arbitration proceeding brought pursuant to Act 111,[1] which authorizes collective bargaining between political subdivisions and their police and provides for binding arbitration in the event of an impasse in negotiations, is limited to questions involving: 1) the jurisdiction of the arbitrators; 2) the regularity of the proceedings; 3) questions of excess in the exercise of powers; and 4) constitutional questions.

This standard of review, however, does not apply here because the case herein does not involve an "interest" arbitration proceeding brought pursuant to Act 111, but rather involves a "grievance" arbitration.[2] Although we are dealing with a dispute between a political subdivision and its police union operating under an Act 111 collective bargaining agreement, the resulting arbitration did not come about because of an impasse in negotiations for a new agreement, and therefore, is not an Act 111 arbitration. Instead, the case before us deals with the validity of the arbitrator's interpretation of the collective bargaining agreement, where the arbitrator determined that Bojanowski was discharged for just cause pursuant to the agreement.

This Court, in *Ringgold Area School District v. Ringgold Education Assn., PSEA/NEA,* 489 Pa. 380, 414 A.2d 118 (1980), set forth the proper standard of review in cases where the arbitrator's award is based on his interpretation of the collective bargaining agreement, i.e., "grievance" arbitration. The arbitrator's award is to be respected if the interpretation can in any rational way be derived from the

1. Act of June 24, 1968, P.L. 237, No. 111, as amended, 43 P.S. §§ 217.1–217.10.
2. A "grievance" arbitration entails the resolution by a third party of a dispute between employer and employee over the proper interpretation of an existing collective bargaining agreement. On the other hand, an "interest" arbitration involves the resolution of an impasse in collective bargaining over the terms of a new contract. *Township of Moon v. Police Officers of the Township of Moon,* 508 Pa. 495, 501 n. 5, 498 A.2d 1305, 1308 n. 5 (1985).

agreement, viewed in light of its language, its context and any other indicia of the parties' intent. *Id.*, 489 Pa. at 383, 414 A.2d at 120. Moreover, this Court has held that an arbitrator's award will be upheld only if the arbitrator's interpretation of the collective bargaining agreement is reasonable. *Philadelphia Housing Authority v. Union of Security Officers # 1,* 500 Pa. 213, 455 A.2d 625 (1983). Applying the correct standard of review to the arbitrator's award herein, I believe the award should be vacated and Bojanowski reinstated.

The facts giving rise to Bojanowski's dismissal, as determined by the arbitrator, are as follows:

... Officer Bojanowski was called by phone by one of the members of the Richmond Auto Association of which he is a member. He received the call while off duty. He went to the home of the member and found that one of the club members had been assaulted by a person wielding a baseball bat and that some damage had occurred to the club's headquarters. He determined to call for a Police Supervisor and did so, reporting a potentially riotous situation.

At approximately 11:40 P.M. on May 25, [1986] then Lieutenant (now Captain) Thomas Barron responded to a radio call regarding a disturbance at 3569 Almond Street. The Lieutenant ordered Wagon 2400 to also respond to the location. As the officers were gathering information three (3) automobiles drove by, one of which was a brown Ford Granada whose car and driver were identified as the same vehicle and driver involved in the above assault. The second car, a Chevrolet Nova, was not involved in either incident and left the area. A third vehicle, a 1971 Chevrolet Malibu, was stopped on Venango Street just west of the intersection of Venango and Almond Streets by Officer Bojanowski who positioned himself in front of the automobile with his gun drawn and identified himself as a police officer and effected an arrest which is not the subject of this arbitration. Two (2) uniformed police officers were also present and assisted Officer Bojanow-

ski in taking the three (3) occupants of the car into custody.

At approximately the same time Officer Bojanowski's attention was drawn to the sound of the screeching of automobile tires from a westerly direction from where he stood. Apparently the brown Ford Granada was observed finishing a U-turn about a block and a half away and thereafter coming east on Venango Street at what appeared to be a high rate of speed. Officer Joseph Tangradi and Officer Bojanowski moved quickly in a westerly direction on Venango Street. The Officers observed the Granada swerve toward two (2) civilians standing in the street who, because of the dark conditions and their line of sight appeared, at least according to Officer Bojanowski, to have been struck and perhaps severely injured if not killed by the driver of the Granada. What happened was that neither civilian was injured because each jumped out of the street and disappeared from view behind a parked truck. The Granada then appeared to head for Officer Tangradi who was by then near the corner of Venango and Livingston Streets. The Granada came to a stop on Venango Street, backed up and started north on Livingston Street. Lt. Barron observed it driving up onto the east sidewalk pinning Officer Bojanowski into a corner formed by a chain link fence and a garage located at 3601 Livingston Street. In the process of pinning Officer Bojanowski into the corner Officer Bojanowski ended up with his firearm drawn, spread eagled on the hood of the car.

As the Granada proceeded toward Officer Bojanowski, Officer Tangradi fired. As the Granada backed toward him he fired again at the driver of the Granada. As the driver put the car into forward gear with the wheels still pointed at where Officer Bojanowski lay, he fired again. Each of Officer Tangradi's shots was considered by the Police Department Internal Affairs to have been taken consistent with his privileges and responsibilities as a Police Officer consistent with Directive # 10 and Training

Bulletin No. 1. (See below) as each shot was fired either to protect Officer Bojanowski or to protect himself.

Almost immediately with the report of Officer Tangradi's third shot, Officer Bojanowski fired six (6) shots. Lt. Barron who observed the above issued a verbal order to cease firing. Officer Bojanowski did not fire any more shots after hearing the order and most likely had decided to stop firing even prior to hearing Lt. Barron's order. (Opinion of the Arbitrator at pp. 2–4, April 24, 1987).[3]

Section XVIII of the collective bargaining agreement in effect between the City and the Union, entitled DISCIPLINE AND DISCHARGE, provides that "No employee shall be disciplined or discharged except as [is] consistent with the Home Rule Charter and the Regulations of the Civil Service Commission." Pursuant to its powers under the Philadelphia Home Rule Charter,[4] the Police Commissioner established a written policy regarding discharges of firearms by police personnel, which is embodied in Philadelphia Police Department Directive # 10 and is part of the agreement by reference. Directive # 10 states in relevant part:

C. A police officer is justified in using deadly force to prevent a person fleeing from arrest or police custody when he believes that no other alternative exists to effect the arrest and knows that:

1. The person fleeing possesses a deadly weapon which he has used or indicates he is about to use; *OR*

2. The person fleeing should be arrested for committing or attempting to commit a forcible felony.

a. FORCIBLE FELONY—means a felony involving actual or threatened serious bodily injury.

**3.** Although the issue was not addressed by the arbitrator, there was a good probability that the driver of the Granada would have repeated his vehicular attack by once again driving a block and a half away and then making another U turn—but for the shots fired by Bojanowski. Bojanowski, in effect, stopped a lethal vehicle at *sure* danger to his own life, and for that, he deserved a medal—not a discharge and years of litigation.

**4.** "The Department shall train, equip, maintain, supervise and discipline the Philadelphia Police." 351 Pa.Code § 5.5–200(b).

(Philadelphia Police Department Directive #10 at p. 1) (Emphasis added).

According to the arbitrator's own findings, the driver of the brown Ford Granada was identified as the person who assaulted a member of the Richmond Automobile Association with a baseball bat and broke his arm. Additionally, the driver later attempted to run over two civilians and crush two police officers with his automobile. Clearly, the driver fit into the definition of a forcible felon.[5]

Despite this, the arbitrator held that Bojanowski used excessive force to prevent the driver from fleeing arrest because "Officer Bojanowski did not know any deadly weapon was possessed by any occupant of the Granada." (Opinion of the Arbitrator at p. 13). Thus, the arbitrator interpreted Directive #10 as justifying the use of deadly force against a person fleeing arrest only if the officer knows that the person possesses a deadly weapon *AND* is a fleeing forcible felon.[6] However, Directive #10 states that the use of deadly force is justified where the officer knows the person fleeing arrest possesses a deadly weapon *OR* is a fleeing forcible felon (Philadelphia Police Department Directive #10 at p. 1). Bojanowski fired at a fleeing forcible felon, and as such, he was justified in using deadly force according to the clear language of Directive #10.[7]

It is well settled that an arbitrator's award will be upheld if the arbitrator's interpretation of the collective bargaining agreement is reasonable. *Philadelphia Housing Authority v. Union of Security Officers #1, supra; International Brotherhood of Firemen and Oilers, AFL–CIO Local 1201 v. School District of Philadelphia,* 465 Pa. 356, 350 A.2d

---

5. In fact, the driver of the brown Ford Granada, Joseph Trimback, was subsequently charged with two counts of aggravated assault on a police officer.

6. *See* Opinion of the Arbitrator at p. 12.

7. Bojanowski's actions were also justified under the terms of Training Bulletin No. 1. The training bulletin mirrors the policy established in Directive #10 and states in relevant part:
   DO NOT FIRE YOUR WEAPON UNLESS YOU KNOW, the person fleeing arrest or police custody has committed or attempted to commit a forcible felony.

804 (1976). Taking into consideration the circumstances of the case before us, I believe that it was unreasonable for the arbitrator to subject Bojanowski to additional criteria not required under the agreement itself. The arbitrator, in his interpretation of the collective bargaining agreement, is not free to ignore the specific terms of the collective bargaining agreement and fashion his own terms. Such an interpretation by the arbitrator would, in effect, strip the police officers of the City of Philadelphia of the right to do their jobs and secure the safety of the citizens that they are pledged to protect. It is manifestly unreasonable that the Union would have bargained away this important right.

Accordingly, I would reverse the decision of the Commonwealth Court and vacate the award of the arbitrator. Bojanowski should be reinstated with full back pay, seniority, pension benefits and all other emoluments.

McDERMOTT, J., did not participate in the consideration or decision of this case.

CAPPY, J., joins this dissenting opinion.

CAPPY, Justice, dissenting.

I join the dissent of Mr. Justice Larsen. I write separately only to emphasize certain facts which I believe the majority has not considered.

During the grievance hearing, several witnesses testified about what happened on May 25, 1986, including three police officers who were involved in or witnesses to the events for which Officer Bojanowski was fired; Captain Thomas Barron, Officer Joseph Tangradi and Ronald Bojanowski.

Captain Thomas Barron testified that he saw the Ford Granada vehicle attempt to strike two citizens and then observed the car head toward Officer Tangradi's direction. He saw the vehicle strike Officer Bojanowski, and saw him sprawled on the hood of the vehicle. He observed Officer Tangradi approximately a car length or so from the rear of the car, in a crouched position. As the car's backup lights

came on, Officer Barron observed two muzzle flashes and heard four shots. He stated that the muzzle flashes were from Officer Tangradi's weapon. The vehicle stopped moving backwards and began to move forward up the street and "[t]here was a rapid succession of gunfire from Officer Bojanowski's gun." Officer Barron also testified that the car was three to four car lengths up the street when the last shot was fired. The other pertinent testimony was as follows:

A. Everything is happening quickly; this man is trying to get away. He hits the gas to go north on Livingston Street. There are two gunshots from Tangradi and the next gunshots come from Bojanowski.

Q. As the car is hitting the gas and going up Livingston Street?

A. That's right. As soon as the car hit the gas and it became clear to me that I didn't believe he was coming back, I gave an order to cease firing.

\* \* \* \* \* \*

Q. The last shot that would have been fired from Officer Bojanowski's weapon, can you indicate for us—you said it was about three or four car lengths from the car? This thing is not drawn to scale, but could you roughly indicate for us where you believe it was?

A. Well, the car was really on the gas. He was moving out.

\* \* \* \* \* \*

Q. Were there shots still being fired after you had given an order?

A. No. It was my impression that my orders were not violated.

\* \* \* \* \* \*

Q. Bojanowski was up the street and he had just been—
A. I don't know. He had just been here. He would be up a little bit up the street; I don't know where he—
Q. He didn't run up the street shooting at this car, did he?

A. No. He wound up a little bit up the street. I don't know where the shots were fired from. There was a rapid succession of shots.

Captain Barron also testified that the whole incident involving the shooting took ten seconds or less.

Officer Tangradi, who also was involved in the incident, testified in a manner consistent with Captain Barron. Tangradi first observed the Ford Granada when it attempted to hit a bystander [1] and then travelled toward himself and Officer Bojanowski.

At the time Bojanowski fired his last shot, Tangradi also stated that the car was "[a]pproximately two car lengths, maybe three [from Bojanowski] at the very outside." The next to last shot was fired, he testified, *when the car was not even off the sidewalk.* Tangradi stated that the command to stop firing came immediately after they had both stopped firing. "At the time when he did that, I had assured him we had already stopped." According to this witness, Bojanowski stated that he thought that he or Tangradi was being fired at from inside the car.

Consistent with the statements of Captain Barron, Tangradi testified that Officer Bojanowski did not run up in the street "popping rounds off at the vehicle."

Officer Bojanowski also testified about the events that occurred on the night in question. Pertinent sections of his testimony are as follows:

Q. Now, when you did shoot, what prompted you to shoot at the car when you did?

A. I was returning gunfire. I was returning the fire that I thought was being fired at me.

\* \* \* \* \* \*

Q. Is it correct that you did not fire out of fear that the vehicle would again be used as a weapon to strike you?

A. I didn't even think of that. All I know is when I heard the gunfire, I opened up.

---

1. There is a discrepancy concerning whether the Granada tried to hit one or two bystanders.

Q. You were no longer concerned, at that point, at the point that you began firing, with the thought that the car might be used as a weapon to run you down?

A. I can't say that, because it could have still been. My mind—the fright of being hit by this automobile, and then the gunfire, I just returned fire immediately.

Q. You were returning what you perceived of as fire. you were not firing to avoid being struck by the vehicle.

A. Correct.

\*   \*   \*   \*   \*   \*

Q. Is it correct, then, that the perceived danger that you perceived, that came when you were pinned on the vehicle, that particular danger was over, as you felt it, or perceived it at the time.

A. I wouldn't know that. He could have backed up.

\*   \*   \*   \*   \*   \*

Q. You were firing, then, in an effort to apprehend, after a gun shot—after what you believed had been gunfire directed at you?

A. To return the gunfire; to stop whoever was firing at me; to stop the gunfire that was coming at me, or anyone else, any way I could stop that person.

\*   \*   \*   \*   \*   \*

Q. Is it correct you were not acting out of a perceived fear of danger to anyone else?

A. No, I was—

Q. For whose safety did you fear?

A. Anybody that was in that area. I thought he had just killed a police officer, or possibly injured him fatally, and a civilian. There are—there could be anyone on that street, and I thought he could take somebody else out, and including myself.[2]

---

**2.** I note that the arbitrator apparently misinterpreted this testimony in his opinion, where he stated: "The grievant testified that he was not in fear of his life or that the vehicle would again be used as a weapon, but used his weapon only because he thought he was returning gun fire."

Q. What gave you a basis to believe [that the occupants were armed]?

A. There was a beating earlier where someone was put in the hospital in critical condition, and also someone had mentioned that earlier, that a—someone had a gun.

\* \* \* \* \* \*

Q. When's the first time you—if ever, that you became aware that Tangradi was on Livingston Street?

A. After the shooting was over.

Q. How much after?

A. A few seconds. I turned around and saw him

\* \* \* \* \* \*

A. [I said] "you all right?" I was shocked.

\* \* \* \* \* \*

A. I was shocked. I thought Tangradi had gotten it. I spun around and he was right here.

\* \* \* \* \* \*

Q. Why did you stop shooting?

A. The car got far enough away. I felt I didn't have to fire any more on it, and that firing at the auto, at that distance, would be inaccurate any way. It's too far away by now, and the danger basically had passed. I still was concerned as the car was going up the street. He was all over the highway. If anybody came out, he would have run them over, God forbid, killed them.

I believe that this testimony clearly supports Bojanowski's claim that he acted properly and within the department guidelines and regulations.

Training Bulletin No. 1 states in pertinent part:

B. a police officer is justified in using deadly force when he/she believes that such force is necessary to prevent death or serious bodily injury to himself or to another person.

C. A police officer is justified in using deadly force to prevent a person fleeing from arrest or police custody

when he/she believes that no other alternative exists to effect the arrest and *knows* that:

1. The person fleeing should be arrested for committing or attempting to commit a forcible felony.

*DO NOT FIRE YOUR WEAPON FROM OR AT MOVING VEHICLES*

*UNLESS* the situation poses a *DIRECT* and *IMMEDIATE* threat to the life of the officer or another, and then only as a last resort.[3]

Directive 10 states, in part:

*DO NOT FIRE YOUR WEAPON*

at a person fleeing arrest or police custody *UNLESS: YOU KNOW* the fleeing person possesses a *DEADLY WEAPON*, which he/she has *USED* or indicates he is about to *USE, AND*

other alternative exists to effect the arrest and all other means of apprehension have been exhausted. *DO NOT FIRE YOUR WEAPON*

*UNLESS YOU KNOW*, the person fleeing arrest or police custody has committed or attempted to commit a forcible felony.

Clearly, Officer Bojanowski's actions were in accordance with these two regulations.

It was perfectly reasonable to assume that a man who had tried to run over two civilians and two police officers, whom Officer Bojanowski believed was firing a weapon at him, would either make a U-turn and come back at the police officers or would attempt to strike another civilian with his vehicle. This madman behind the wheel without question posed a very real and serious threat to the civilians

---

**3.** On August 12, 1986, Directive # 10 was modified to add language as follows:

D. Shooting at a vehicle is considered the used of deadly force, and is only justified if the vehicle or its occupants present an immediate threat of death or serious bodily injury. Shooting at a vehicle or its occupants merely to prevent flight is not justified at any time.

While this language creates a stricter standard for discharging a firearm, this modification cannot be retroactively applied to the incident forming the basis for this case.

who he attempted to run down; to Officers Tangradi and Bojanowski; to other officers present at the scene; and to any bystander unlucky enough to be within striking range of his vehicle.

Nevertheless, since May 26, 1986, this issue has been litigated in the courts and numerous hours have been spent trying to ascertain exactly what happened in the *ten seconds* between the time the car came down the street aiming at two citizens and the time when the last of Bojanowski's six shots was fired. It strains credibility to believe that a precision-like dissection of this ten second incident results in reasonable people actually debating whether this policeman's split second decision to fire the additional shots in rapid succession—when no cease fire order had been given—was warranted.

My impression of this case is that it has been decided not on the facts, but by the unfortunate results of this incident. A small child in the back of the Granada vehicle was injured with a bullet. However, it was not Officer Bojanowski's decision to place that child in such a perilous position. The driver of the Granada vehicle made that decision; the veritable boy scout of a citizen who aimed his vehicle at two civilians, causing them to leap behind a truck in order to avoid being hit; the same driver who aimed at and *struck* Officer Bojanowski with his vehicle in an attempt to crush him into the wall; the same driver who backed up and attempted to run over Officer Tangradi and then head in Officer Bojanowski's direction, furiously accelerating. Officer Bojanowski believed that Tangradi and two bystanders had been fatally injured—he was absolutely justified in firing at the vehicle until the cease fire order.

I believe that the arbitrator looked at the physical evidence—45 caliber shells at intervals along the street—to support his conclusion that Officer Bojanowski ran up the street.[4] He also assumed that the car was moving away

4. It should be noted that *two hours* passed between the time of the shooting and the time the forensic team found the first shell casing. With the excitement and the number of people milling about, it is

from the officers when Bojanowski fired his first shot. This was not the testimony.

Further, the arbitrator relied on the prohibition "DO NOT FIRE YOUR WEAPON unless you know" that the person possesses a deadly weapon. The arbitrator apparently ignored the fact that the vehicle, as it was being used, was as deadly a weapon as a firearm.[5] Furthermore, any police officer who reasonably *believes* that he is being fired upon has a right to defend himself. He need not be shot first before making the decision to return fire.

For the reasons stated herein, I would not find that the arbitrator's findings are supported by substantial evidence in so far as he disregarded a vast majority of the testimonial evidence. I dissent.

McDERMOTT, J., did not participate in the consideration or decision of this matter.

entirely possible that those shell casings were no longer in their original resting place by the time they were found. In any event, the physical evidence is contradicted by the testimonial evidence. Since the arbitrator did not find *all* the witnesses not credible, it was an abuse of his discretion to disregard *all* their testimony. There was not a scintilla of testimonial evidence that Officer Bojanowski ran down the street, chasing the vehicle and firing at it.

5. 18 Pa.C.S.A § 2301 defines "deadly weapon" as follows:
   Any firearm, whether loaded or unloaded, or any device designed as a weapon and capable of producing death or serious bodily injury, *or any other device or instrumentality which, in the manner in which it is used or intended to be used, is calculated or likely to produce death or serious bodily injury.* (emphasis supplied).