713 A.2d 1218 (1998)
TOWNSHIP OF PENN, York County, Pennsylvania
v.
AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO, DISTRICT COUNCIL NO. 89, and Dennis Guyton, Appellants.
Commonwealth Court of Pennsylvania.
Submitted on Briefs May 8, 1998.
Decided June 30, 1998.
Alaine S. Williams, Philadelphia, for appellants.
Walter A. Tilley, III, York, for appellee.
Before PELLEGRINI and FRIEDMAN, JJ., and JIULIANTE, Senior Judge.
FRIEDMAN, Judge.
The American Federation of State, County and Municipal Employees, AFL-CIO, District Council No. 89 (Union) and Dennis Guyton appeal from an order of the York County Court of Common Pleas (trial court) which vacated an arbitrator's award and granted *1219 the petition of Township of Penn, York County (Township) to reinstate Guyton's termination. We affirm.
The Township operates a Waste Water Treatment Plant (Plant). (R.R. at 37a.) The Union, on behalf of certain Plant employees, and the Township were parties to a collective bargaining agreement (agreement), effective January 1, 1995 through December 31, 1998.[1] (R.R. at 1a.) Article 14 of the agreement sets forth a grievance and arbitration procedure, the final step of which provides for the right of arbitration if the grievance is not settled.[2] (R.R. at 19a-20a.) Guyton was employed by the Township as a Plant Operator I; Guyton's termination on January 25, 1996 prompted this case.
On January 22, 1996, David Saltzgiver, a Plant Operator III, assigned Guyton and David Young, a Plant Operator II, to clean certain problem areas in the sewer collection system.[3] After receiving their work assignments, Guyton and Young left the Plant, presumably to perform their assigned tasks. (R.R. at 52a.)
Later that day, Saltzgiver observed that the water levels in the tanks on the truck used by Guyton and Young were identical to the water levels when the truck left the Plant earlier that day and that the flushing hose was dry, indicating that the sewer lines had not been cleaned. (R.R. at 38a-39a.) Saltzgiver questioned Guyton, who indicated that he and Young had started cleaning at Mullertown and Westminster Avenue; however, based on the condition of the truck, Saltzgiver suspected that the work had not been performed as Guyton stated. (R.R. at 39a.)
Saltzgiver reported his suspicions to William Mahone, the Plant Superintendent, who personally inspected the manholes at the locations Guyton claimed to have cleaned; Mahone determined that the manholes never had been opened. (R.R. at 39a.) Mahone then asked Guyton which areas he had cleaned, and Guyton indicated that he and Young had cleaned various locations. (R.R. at 39a.) When Mahone asked Young the same question, Young identified the identical areas named by Guyton. (R.R. at 39a.) Mahone informed Young of his inspection of the manholes and of his conclusion that the manhole covers had never been opened. (R.R. at 39a.) In response, Young stated that he and Guyton had been unable to remove the manhole covers at the troubled area, so they flushed the water from the next manhole. (R.R. at 39a.)
The next morning, Mahone asked Guyton to show him on a map the exact manhole covers which had been opened to clean the sewer line. (R.R. at 40a.) At this time, Guyton acknowledged that he and Young had not performed any cleaning, and, when Mahone asked Guyton what the two men did the morning of January 22, Guyton failed to give a definitive answer. (R.R. at 40a.) Mahone then conferred with Jeffrey Garvick, the Township Manager, who advised Mahone to conduct a pre-disciplinary hearing. (R.R. at 40a.) Mahone conducted the hearing and recommended that the Township terminate Guyton and Young. (R.R. at 40a.) Garvick received Mahone's report and recommendation, conducted his own review of the matter and determined that the incident involved willful insubordination, or disobedience, a Group I offense under the Township Guidelines.[4] *1220 (R.R. at 40a.) Garvick decided that, because Young had a clean disciplinary record, Young would receive a three day suspension, the maximum suspension allowed by the Guidelines. (R.R. at 40a.) However, Garvick felt that, because Guyton had a lengthy disciplinary record,[5] there was no reason to mitigate Mahone's recommendation, and, accordingly, the Township terminated Guyton.
The Union grieved the Township's action on behalf of Guyton,[6] alleging that the termination was without just cause, and the matter proceeded to arbitration.[7] (R.R. at 40a.) Following an arbitration hearing, an arbitrator[8] sustained the grievance in part and found that, although Guyton acted improperly on January 22 and just cause existed to discipline Guyton, Guyton's actions did not warrant termination.[9] (R.R. at 45a-46a.) The arbitrator held that it was unclear that Guyton's actions on January 22 constituted an incident of "willful insubordination" which would justify termination.[10] Further, the arbitrator concluded that, even assuming that Guyton committed a Group I offense, that would not automatically justify his termination because the Township exhibited a practice of using discretion as to whether a Group I offense would lead to termination. In fact, the arbitrator determined that the Township failed to properly exercise this discretion when it terminated Guyton but gave Young only a three day suspension for the same act, thus creating a drastically disparate penalty for the two employees.[11] Accordingly, *1221 the arbitrator concluded that there was not just cause to terminate Guyton within the meaning of the agreement and ordered Guyton's reinstatement.[12] (R.R. at 49a.)
The Township filed a Petition to Modify the Arbitration Award, and, subsequently, a motion for summary judgment, requesting that the trial court modify the arbitrator's award and reinstate Guyton's termination. The trial court concluded that the arbitration award was "manifestly unreasonable" in light of the arbitrator's findings and stated:
It is apparent that the Arbitrator mixes metaphors by saying that [Guyton] "did not refuse to follow directives ... he simply did not follow them." A definition of willful insubordination can simply mean that one is voluntarily not submissive to authority. One need not have an open rebellion to rise to the level of willful insubordination. Voluntary non-action by an employee, in spite of direction to the contrary, may suffice. [Guyton's] consciousness or awareness of his improper actions may be inferred from his lying about his performance of these tasks. Not only do the lies provide insight into the degree of [Guyton's] conduct, the lies themselves provide independent acts of insubordination. [Guyton] was asked by his employer as to what work was performed as a result of employer's directive and he proceeded to tell voluntarily a non-truth.
The Arbitrator went beyond the [a]greement and Rules evaluating how Young was treated and contrasting Young with Guyton, who had a substantial disciplinary history.
(R.R. at 61a.) Based on the foregoing reasons, the trial court held that the arbitration award did not draw its essence from the agreement, and, therefore, the trial court reinstated Guyton's termination. The Union now appeals from the order of the trial court, arguing that the arbitration award draws its essence from the agreement between the Township and the Union and, thus, must be confirmed.
It is well-settled that an appellate court's scope of review of a grievance arbitration award is the "essence test." School District of Springfield Township v. Springfield Township Educational Support Personnel Association, 711 A.2d 602 (Pa.Cmwlth.1998). We are limited under the essence test to determining whether the arbitrator's award can in any way be rationally derived from the collective bargaining agreement in light of the language of the agreement, its context and any other indicia of the parties' intention. Id.; American Federation of State, County and Municipal Employees, District Council 88, AFL-CIO v. City of Reading, 130 Pa.Cmwlth. 575, 568 A.2d 1352 (1990) (AFSCME). This court may not review the merits of the arbitrator's decision, nor may we substitute our judgment for that of the arbitrator, even if our interpretation of the collective bargaining agreement would differ from that of the arbitrator.[13]AFSCME. Accordingly, "`the arbitrator's interpretation of the contract must be upheld if it is a reasonable one.'" Id. at 1355 (quoting International Brotherhood of Firemen & Oilers, AFL-CIO Local 1201 v. School District of Philadelphia, 465 Pa. 356, 366, 350 A.2d 804, 809 (1976)).
In this case, the issue before the arbitrator was whether just cause existed to *1222 warrant Guyton's termination, and, if not, what the appropriate remedy should be. While the agreement permits the Township to terminate its employees when just cause exists, the agreement does not, as in other collective bargaining agreements, define just cause.[14]See AFSCME. Accordingly, the arbitrator possesses the power to interpret the just cause provision of the agreement. School District of Springfield Township; Upper St. Clair School District v. Upper St. Clair Educational Support Personnel Association, ESPA, PSEA NEA, 168 Pa.Cmwlth. 1, 649 A.2d 470 (1994); McKeesport Area School District v. McKeesport School Service Personnel Association, PSSPA/PSEA, 137 Pa.Cmwlth. 28, 585 A.2d 544 (1990); see AFSCME. Here, while the arbitrator found that just cause did exist to discipline Guyton, the arbitrator specifically determined that termination was the improper penalty. (R.R. at 46a-48a.) However, once the arbitrator determined that Guyton had engaged in the misconduct for which he was terminated so that just cause existed for the Township to discipline Guyton for that conduct,[15] the arbitrator was without authority to alter the discipline imposed by the Township in order to obtain what the arbitrator felt was a more suitable result. See Manheim Central Education Association v. Manheim Central School District, 132 Pa.Cmwlth. 94, 572 A.2d 31 (1990), appeal denied, 525 Pa. 661, 582 A.2d 326 (1990).[16] Indeed, the limit of the arbitrator's authority is reflected in the parties' framing of the issue; the arbitrator was only to consider the penalty imposed if he found that just cause did not exist. Because the arbitrator found that just cause did exist, the arbitrator's modification of the discipline imposed by the Township in this case was improper. Manheim.
Accordingly, we affirm the order of the trial court vacating the award of the arbitrator and reinstating Guyton's termination.

ORDER
AND NOW, this 30th day of June, 1998, the order of the Court of Common Pleas of York County, dated September 26, 1997, at No. 97-SU-00789-0, is hereby affirmed.
PELLEGRINI, J., concurs in the result only.
NOTES
[1] The Union represents Plant employees classified as Plant Operator I and Plant Operator II. (R.R. at 37a.) Plant Operator I employees "perform[ ] entry-level plant operation and laboratory testing for operational parameters," while Plant Operator II employees "operate[ ] or supervise[ ] the operation of the treatment facilities that control flow and processing of waste water, residual and final effluent" and are only to perform lead work responsibilities if the Operator III or Plant Superintendent is absent. (R.R. at 37a.) Plant Operator III employees perform supervisory duties and make the daily work assignments to Plant personnel; they are not included in the bargaining unit. (R.R. at 37a.)
[2] The final step of section 1 of Article 14 of the agreement provides, in relevant part, "[t]he arbitrators shall neither add to, subtract from, nor modify the provisions of this agreement. The arbitrators shall confine themselves to the precise issue submitted for arbitration and shall have no authority to determine any other issue not so submitted to them." (R.R. at 20a-21a.)
[3] Specifically, Guyton and Young were assigned to the sewer lines on Westminster Avenue, South Blettner Street, Hill Street and, later, a clogged sewer line on Baer Avenue. (R.R. at 52a.)
[4] The Township Guidelines describe Group I offenses as "violations of intent subjecting employees to immediate dismissal." (R.R. at 37a-38a.)
[5] Specifically, Guyton had received: (1) a written warning for using a Plant vehicle for personal use; (2) verbal warnings for inaccurate test results, poor attitude and performance, misreading deduction meters and creating discord with other Plant employees; (3) a written warning for careless work performance and for damaging Township property; (4) a written warning for causing a traffic accident when he pulled a Township vehicle from a cross street into the path of an oncoming car which had the right-of-way; and (5) a suspension for misrepresenting that his son was a college student, and, thus, entitled to medical insurance coverage when, in fact, his son never attended post-secondary school. (R.R. at 55a.)
[6] Section 903 of the Public Employe Relations Act (Act 195), Act of July 23, 1970, P.L. 563, as amended, 43 P.S. § 1101.903, illustrates the legislature's interest in promoting collective bargaining by having grievances resolved not by strikes, boycotts or lockouts, but, rather, through a grievance procedure, with the final step of arbitration to be taken by either party to the agreement. The policy in this Commonwealth mandates the arbitration of public employee grievances arising out of the provisions of a collective bargaining agreement, and the settlement of labor disputes via arbitration is considered "`part and parcel of the collective bargaining process itself.'" American Federation of State, County and Municipal Employees, District Council 88, AFL-CIO v. City of Reading, 130 Pa.Cmwlth. 575, 580, 568 A.2d 1352, 1354 (1990) (quoting United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 578, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960)).
[7] The following issues were presented to the arbitrator: "Was there just cause for the termination of [Guyton]? If not, what shall be the remedy?" (R.R. at 36a.)
[8] The Township and the Union agreed that a single arbitrator would resolve the issues instead of presenting them to a tripartite arbitration panel. (R.R. at 56a.)
[9] In his opinion, the arbitrator held that "the Township has abundantly established that just cause existed to discipline [Guyton]. The question therefore becomes whether just cause existed to discipline [Guyton] by way of termination. After careful consideration, I am persuaded by the Union that it did not." (R.R. at 46a) (emphasis added.)
[10] In determining that Guyton's actions were not willful insubordination so as to justify termination pursuant to the Guidelines, the arbitrator stated:

Insubordination of the type understood to constitute just cause for termination normally involves an employee refusing to perform a task or to comply with an order given him by a superior. Here[, Guyton] did not refuse to follow Saltzgiver's directives on the morning of January 22, he simply did not follow them. While the difference between refusing to perform work assigned and not doing the work may not be great, it is real insofar as the commonly understood meaning of workplace insubordination is concerned.
(R.R. at 46a.)
[11] With regard to the fact that Guyton had a prior disciplinary record while Young did not, the arbitrator held that this could not be the only justification for imposing a different penalty on the two employees and stated, "[w]hile [Guyton's] prior record was indeed not exemplary, prior to January 22 the strongest disciplinary penalty [Guyton] had received was a one day suspension." (R.R. at 48a.)
[12] While the arbitrator ordered Guyton reinstated to his former position with full seniority, the arbitrator determined that it should not be accompanied by back pay because the Township had established that Guyton committed a serious offense and that permitting back pay would send the wrong message to Guyton and the other employees. (R.R. at 48a-49a.)
[13] In AFSCME, we stated:

The function of the court is very limited when the parties have agreed to submit all questions of contract interpretation to the arbitrator. It is confined to ascertaining whether the party seeking arbitration is making a claim which on its fact [sic] is governed by the contract. Whether the moving party is right or wrong is a question of contract-interpretation for the arbitrator. In these circumstances the moving party should not be deprived of the arbitrator's judgment, when it was his judgment and all that it connotes that was bargained for.
AFSCME, 568 A.2d at 1355 (quoting United Steelworkers of America v. American Manufacturing Co., 363 U.S. 564, 567-68, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960)).
[14] Here, Section 1 of Article 17 of the agreement provides, (emphasis added), "[t]he Employer shall not demote, suspend, discharge or take any disciplinary action against an employee without just cause." (R.R. at 25a.)
[15] In his opinion, the arbitrator assumed that Guyton's conduct constituted a Group I offense for which termination is a suitable discipline, but, nonetheless, altered the penalty for Guyton because the arbitrator felt that the discipline was unfairly meted out between the two employees.
[16] In Manheim Central Education Association we stated:

The arbitrator concurred in the [Liquor Control Board] findings that [the grievant] committed the charged acts of impropriety. That finding established the "just cause" for the dismissal. At that point, the inquiry should have ended and the [Liquor Control Board] action sustained. The further actions by the arbitrator in this manner cannot rationally be derived from the collective bargaining agreement.
Manheim Central Education Association, 572 A.2d at 35 (quoting Pennsylvania Liquor Control Board v. Independent State Stores Union, 520 Pa. 266, 278, 553 A.2d 948, 954 (1989)).