**FIRE FIGHTERS LOCAL NO. 60 OF the INTERNATIONAL ASSOCIATION OF FIREFIGHTERS, AFL–CIO, Appellants**

v.

**CITY OF SCRANTON.**

Commonwealth Court of Pennsylvania.

Argued Oct. 30, 2007.

Decided Nov. 30, 2007.

Stephen J. Holroyd, Philadelphia, for appellant, Fire Fighters Local Union No. 60.

Richard M. Goldberg, Kingston, for appellee.

BEFORE: FRIEDMAN and SIMPSON, JJ., and McCLOSKEY, Senior Judge.

OPINION BY Senior Judge McCLOSKEY.

Appellant Firefighters Local Union No. 60 (the Union) appeals from an order of the Court of Common Pleas of Lackawanna County (the trial court), dated April 3, 2007, which denied the Union's petition to review and vacate an arbitration award that was issued in favor of Appellee City of Scranton (the City). We now vacate and remand.

The City employs fire fighters who are represented for the purposes of collective bargaining by the Union. This relationship has been embodied in a series of collective bargaining agreements and interest arbitration awards issued under the auspices of the Collective Bargaining For Policemen or Firemen Act, Act of June 24, 1968, P.L. 237, *as amended*, 43 P.S. §§ 217.1–217.10 (Act 111). The most recent collective bargaining agreement (the CBA) has a stated term of January 1, 1996, to December 31, 2002, but it continues to remain in full force and effect pending arbitration of a successor agreement. (R.R. at 2a–26a).

The CBA contains, in part, the following provisions:

ARTICLE VIII

WAGES

* * *

8. All past agreements between the parties, all prior arbitration awards between the parties including all of the provisions of said agreements and awards, *and all of the past practices of the City of Scranton which inure to the benefit of the bargaining unit* shall be

continued, and are hereby incorporated by reference herein as fully as though the same were set forth at length, and are hereby made a part hereof, except as the same are specifically modified herein.

* * *

## ARTICLE XIX

## SAFETY AND HEALTH

1. The City and the Union shall cooperate in the area of safety. Periodic on-duty safety meetings shall be held and safety training shall be emphasized.

(R.R. at 10a, 20a) (emphasis added).

The facts giving rise to the Union's grievance do not appear to be in dispute. Prior to January, 2004, the "standard deployment" by the City's fire department (the Fire Department) of personnel and apparatus for responding to automated alarms consisted of two (2) fire engine companies, one (1) rescue company, one (1) truck company and a supervisor's vehicle. The Fire Department had utilized this standard deployment when responding to automated alarms for at least the past twenty (20) years. The only exception to the standard deployment was when the City experienced extremely inclement weather, resulting in hazardous driving conditions due to ice and snow. Under those circumstances, the Fire Department would engage in a reduced deployment by dispatching one (1) engine company to assess the situation so that a lesser number of the Fire Department's vehicles would be operated while road conditions were hazardous. Such instances were not commonplace, and a veteran firefighter estimated that the reduced deployment due to hazardous conditions occurred approximately twenty-five (25) times in the past twenty (20) years and would ordinarily last no more than one (1) or two (2) days while the weather was "absolutely extreme."

Beginning in January, 2004, the City, through Fire Chief Thomas Davis (the Fire Chief), unilaterally issued a series of memoranda, changing the standard deployment for automated alarms. On January 14, 2005, the City directed that due to inclement weather conditions, the modified response to an automated fire alarm would be a single engine company only. The issuance of the memoranda was not inconsistent with past practice as it pertained to hazardous conditions.

In the past, a modified response due to inclement weather would remain in effect for only one (1) or two (2) days until the streets were cleared. Within one (1) or two (2) days of January 14, 2005, the condition of the roads improved, and they could be safely navigated. Regardless, the modified response remained in effect for a number of days. The Union inquired of the Fire Chief as to why there was still only the deployment of a single engine company for automated alarms despite the fact that the inclement weather was no longer a factor. The Fire Chief informed the Union that the modification would remain in effect. This was the first time that the Union was aware of the City's intention to reduce the deployment of personnel and apparatus for responding to automated alarms. The Union had not been consulted or informed of the intended change prior to its implementation. Additional conversations took place during which the Union expressed to the Fire Chief concerns regarding the negative effect this policy would have in terms of safety.

On January 14, 2004, the Union filed a grievance, alleging that the City violated the Safety and Health (Article XIX) and Past Practice (Article VIII) provisions of the CBA when it changed the procedures

to be followed when the Fire Department responds to automated alarms. After the filing of the grievance, the Union continued to have discussions with the Fire Chief and the City's Director of Public Safety regarding the potential negative repercussions of the newly implemented policy. By memorandum dated February 11, 2004, the Fire Chief authorized the assistant chief and a truck company to respond as well. By memorandum dated May 28, 2004, the Fire Chief added Rescue 1 to the complement that responded to automated alarms, after having been informed that the CBA requires Rescue 1 to respond to every alarm.

A hearing was conducted during which the parties presented evidence regarding firefighter safety, past practices and a recent study of automated alarms in the City. Arbitrator Edward J. O'Connell (the Arbitrator) issued a decision on August 24, 2006, denying the Union's grievance. The Union filed a petition to review and vacate the award with the trial court, which petition the trial court dismissed by opinion and order dated April 3, 2007. The Union then appealed the matter to this Court.

On appeal,[1] the Union argues that the trial court erred in failing to conclude that the Arbitrator exceeded his jurisdiction and powers and created irregularities in the proceedings by addressing an issue not before him. The Union also argues that the trial court erred in failing to conclude that the Arbitrator deprived the Union of its constitutional rights by basing his decision upon a "lack of evidence" on an issue that was not submitted or considered by the parties or made aware to the parties until after the Arbitrator's decision was issued.[2]

It is well-settled that an arbitrator exceeds his jurisdiction by addressing issues not submitted by the parties. *Marple Township v. Delaware County Fraternal Order of Police, Lodge No. 27*, 660 A.2d 211 (Pa.Cmwlth.1995). In *Marple Township*, this Court explained that "[a]rbitrators are required to address the issues submitted within the context of the positions of the parties and effectuate the relief requested, not to reform the collective bargaining agreements." *Marple Township*, 660 A.2d at 215.

■ The Union contends that the Arbitrator improperly rejected the Union's argument that the City had unilaterally modified a long-standing past practice in violation of Article VIII of the CBA after applying an analysis that the Arbitrator raised wholly on his own without notice to the parties. The Union takes issue with the portion of the Arbitrator's decision which reads as follows:

Applying the Shulman analysis to this dispute, it must be initially concluded that the two engine company response complement appears to be one of the 'other practices' he describes. Its origins are unclear and it has not been shown to be the result of joint determi-

1. An appellate court is to employ a "narrow certiorari" scope of review when it reviews a grievance arbitration award under the Act 111. *See Pennsylvania State Police v. Pennsylvania State Troopers' Association (Betancourt)*, 540 Pa. 66, 656 A.2d 83 (1995). The narrow certiorari scope of review limits courts to reviewing questions concerning: (1) the jurisdiction of the arbitrators; (2) the regularity of the proceedings; (3) an excess of the arbitra-

tor's powers; and (4) deprivation of constitutional rights. *Betancourt*.

2. The City submits that the issues are more appropriately stated as the following one issue: whether, applying the narrow certiorari scope of review, the award should be vacated because the Arbitrator exceeded his jurisdiction or powers, deprived the grievants of their constitutional rights or conducted an improper or illegal proceeding?

nation. Therefore, it should not by itself prevent the exercise by the City of what otherwise would be deemed a basic prerogative of management.

(Arbitrator's Decision and Award at p. 11, attached to the Union's brief as Exhibit B).

First, the Union argues that the Arbitrator exceeded his jurisdiction and powers and created irregularities in the proceedings by addressing an issue not before him. The Union states that the collective bargaining agreement between the parties contains extremely broad and inclusive "past practice" language that insulates those past practices from unilateral modification. The Union explains that there can be absolutely no question that the deployment for automated alarms prior to January 14, 2004, was a "past practice" within the meaning of the contract, and the Arbitrator erred in further determining the "type" of past practice and its applicability. The Union also states that the importance of this practice to the Union and its effect on a substantial term or condition of employment is self-evident because the unilateral change affects the safety of its members.

The Union argues that, in the absence of a written agreement, in order to establish that a past practice is binding on both parties, it should have been required to show only that the past practice was: (1) unequivocal; (2) clearly enunciated and acted upon; and (3) readily ascertainable over a reasonable period of time as a fixed and established past practice accepted by both parties. *See* Frank Elkouri and Edna Asper Elkouri, *How Arbitration Works,* p. 632 (5th Ed.). The Union states that it did not offer any evidence as to the origin of the past practice because it did not consider such to be an element for a *prima facie* showing of a past practice, nor was it an element necessary for the practice to be binding under the CBA. The

Union notes that matters relating to the origins of the past practice had not been raised by either party or the Arbitrator at any time during the two-days of testimony. Rather, the City presented evidence focusing on the existence of instances when the City had modified responses (not involving automated alarms) in the past without objection by the Union.

Although the sole question presented to the Arbitrator was whether a past practice existed, the Union contends that he focused instead on the origin of the past practice and the underlying considerations of the parties. The Union takes the position that the Arbitrator ultimately acknowledged the existence of a past practice, but did not apply it as a binding past practice because it had not been shown to be the result of joint determination. The Arbitrator raised the issue of whether the past practice was a result of joint determination or mere happenstance sua sponte for the first time after the hearing had closed. The Union asserts that this conduct is prohibited by Article XXI of the CBA which provides, in part, that the "arbitrator shall confine himself to the precise issues submitted for arbitration and shall not have authority to determine any other issues not so submitted to him." (R.R. at 24a). In raising the issues related to the origins of the past practice, the Union contends that the Arbitrator exceeded his jurisdiction.

The City contends that under the narrow certiorari standard of review of an Act 111 arbitration award, this trial court's decision affirming the arbitration award must be upheld, as the Arbitrator properly addressed the issue before him and crafted an appropriate award within the scope of the CBA. The City notes that the scope of review in Act 111 arbitration proceedings is severely limited, and the legislature dictated a restraint on judicial activity in this

arena in order to ensure swift resolution of disputes. Moreover, the burden in a contract interpretation case lies with the Union.

The City asserts that all of the issues addressed by the Arbitrator were raised by the parties. The City disputes that the Arbitrator raised issues sua sponte in denying the Grievance. It states that in addressing whether the Union's alleged past practice was to be given effect, the Arbitrator was required to consider the competing interests of past practices and management prerogatives. The City asserts that a review of the Arbitrator's decision reveals that the crux of the issue considered by the Arbitrator was the conflict between past practices and management rights. It was in this context that the Arbitrator considered the manner in which the past practice originated. The origin of the practice was one of many factors that the Arbitrator considered when analyzing the issue before him.

We are not persuaded that the analysis applied by the Arbitrator in this situation was improper or overly broad. The Arbitrator engaged in a lengthy and well-reasoned discussion of circumstances that must be considered in determining whether a practice which has been shown to exist is to be given binding effect. The Arbitrator distinguished between those practices that previously were arrived at through mutual agreement or joint determination from those practices that merely developed over time or by happenstance. The former types of practices the Arbitrator elevated to the status of "binding past practice" without further evaluation of competing factors. However, absent evidence that a practice had originated through mutual agreement or joint determination, the Arbitrator determined that he had to engage in a balancing of competing interests to determine whether an established practice rose to the level of "binding past practice." The Arbitrator noted that distinctions may be made between matters which involve the direction of the working force and those which involve a benefit of peculiar personal value to employees.[3] The Arbitrator considered the inherent right of the City to allocate its resources to a certain extent, the perceived increases in risk to the bargaining unit and the undisputed statistics surrounding responses to automated alarms.[4] Applying a balancing test, the Arbitrator then determined that the action taken by the City could not be viewed as compromising the safety of the Union members in a significant way, such that the practice could not be changed by the City. Hence, the Arbitrator determined that a binding past practice did not exist.

---

3. This interpretation is consistent with Article VIII, Section 8 of the CBA, which makes binding past practices "which inure to the benefit of the bargaining unit...." (R.R. at 10a).

4. When considering the statistics relating to responses to automated fire alarms, the Arbitrator wrote:

> Third, as to that precise issue it is found that the elimination of one engine company along with a corresponding reduction in the firefighter complement from thirteen to ten or eleven is not unreasonable where the automated alarms they are responding to are false 98% of the time. In the two percent of the cases where the alarms are not false and a working fire is encountered, the ability of the responders to immediately summon additional forces beyond the ten or eleven already there should allay Union fears about the adequacy of the fire-fighting complement. In that connection the record shows that there are eight firehouses located throughout the City which has an area of approximately 26 square miles. Additional apparatus and firefighters are unlikely to be far way.

(Arbitrator's Decision and Award at p. 12, attached to the Union's brief.)

In making the determination, we cannot conclude that the Arbitrator exceeded his powers and authority by addressing an issue not before him. The origin of the practice at issue was one component of the analysis applied. Hence, it was proper for the Arbitrator to consider it.

However, although we are satisfied that the Arbitrator engaged in a reasonable and thorough analysis and did not raise the issue sua sponte, we must still address the due process issues raised by the Union. The Union argues that the trial court erred in failing to conclude that the Arbitrator deprived the Union of its due process rights by basing his decision upon a "lack of evidence" on an issue that was not submitted or considered by the parties or made aware to the parties until after the Arbitrator's decision was issued.

■ At its core, procedural due process requires "adequate notice, opportunity to be heard, and a chance to defend oneself before a fair and impartial tribunal having jurisdiction over the case." *Krupinski v. Vocational Technical School,* 544 Pa. 58, 61, 674 A.2d 683, 685 (1996). Courts of this Commonwealth have routinely held that the fundamental mandates of due process extend to arbitration proceedings. *See Fraternal Order of Police Lodge No. 5 v. City of Philadelphia,* 725 A.2d 206 (Pa. Cmwlth.1999).

The Union argues that the Arbitrator failed to uphold the required standards of fundamental fairness. The Arbitrator placed the burden on the Union to provide evidence with respect to the origin of the practice. However, the Union did not present any evidence regarding the origin of the practice because it had not been given any indication by the Arbitrator that the origin of the practice would be a component of his analysis.

The City counters that the Union was not denied an opportunity to be heard. It reiterates that the City had the burden of presenting evidence sufficient to prove its contention. The grievance filed by the Union admits and acknowledges that the issue involved in the proceeding relates to past practice, and the Union should have thoroughly addressed any and all issues it related to past practice. The City should not now be penalized for the Union's failure to satisfy its burden of proof. Additionally, the City argues that the Union's failure to proffer evidence during the arbitration proceeding is not reviewable by the Court.

■ Our review of the record of the proceeding reveals that neither party made any attempt to address the issue of the origin of the practice nor did the Arbitrator inform the parties that he considered such evidence to be significant in the case at hand. The City, in its reply brief, attempts to argue that because it raised the basic issue of "management's rights," the Union should somehow have known that the issue of the origin of the past practice was clearly before the Arbitrator. Such argument is without merit. Moreover, we note that at no point does the City state that it was aware that the origin of the practice would be a component of the Arbitrator's analysis. This Court does not believe that either party realized that such would be the case. Under these circumstances, we must conclude that the standards of fundamental fairness required for due process were not satisfied.

Accordingly, we must vacate the order of the trial court and remand the matter so that it may be remanded to the Arbitrator to provide the parties with the opportunity to present evidence concerning the origin of the practice at issue.

### *O R D E R*

AND NOW, this 30th day of November, 2007, the order of the Court of Common

 

Pleas of Lackawanna County is hereby vacated. The matter is remanded with instructions that it be further remanded so that the parties may present evidence relating to the origin of the practice at issue.

Jurisdiction is relinquished.