The CITY OF WILKES–
BARRE, Appellant

v.

WILKES–BARRE FIRE FIGHTERS
ASSOCIATION LOCAL 104, Interna-
tional Association of Fire Fighters,
AFL–CIO.

Commonwealth Court of Pennsylvania.

Argued Feb. 8, 2010.
Decided March 22, 2010.

Donald H. Brobst, Wilkes–Barre, for ap-
pellant.

Stephen J. Holroyd, Philadelphia, for
appellee.

BEFORE: SIMPSON, Judge, BROBSON, Judge, and FLAHERTY, Senior Judge.

OPINION BY Judge BROBSON.

The City of Wilkes–Barre (the City) appeals an order of the Court of Common Pleas of Luzerne County (trial court) that denied the City's petition to review arbitration opinion and award and affirmed an Act 111[1] grievance arbitration award (Award) in favor of the Wilkes–Barre Fire Fighters Local Union (Union). In the Award, Arbitrator Robert E. Light (Arbitrator) concluded that: (1) grievance filed by the Union was subject to arbitration and (2) the Union had proved that the City had violated the applicable collective bargaining agreement (CBA) with regard to parity provisions between firefighters and police officers.

The facts as revealed in the arbitrator's Award are summarized below. The Union and the City were parties to a CBA that covered the period from January 1, 1997, through December 31, 2000 (CBA 1). When, at the end of that period, the City and the Union were unable to agree to the terms of a new CBA, they began to engage in interest arbitration under the law commonly known as Act 111. That arbitration produced an interest arbitration award (IAA), which applied to the period from January 1, 2001, through December 31, 2003. The IAA did not affect a "parity" provision contained in CBA 1, which required that Union members receive parity in wages with members of the City's police department.

By the time the IAA expired at the end of 2003, the Union and the City were unable to agree to terms of a new CBA and, consequently, again engaged in interest arbitration. Before an arbitrator resolved the arbitration, the parties entered into a settlement agreement that they agreed would be incorporated into a new CBA (CBA 2). The parties signed CBA 2 on February 28, 2005, and that agreement covers the period from January 1, 2004, through December 31, 2010. CBA 2 includes a provision that waives the parity provision of CBA 1 for the period covered by CBA 2.

On October 5, 2007, the Union filed a grievance. The Union's grievance focused on a document titled "Memo of Understanding," which was an agreement between the City and the Police Benevolent Association (PBA Memo or Memo), executed on or about July 12, 2002. The PBA Memo purports to increase the police unit bargaining members' yearly compensation. In its grievance, the Union claimed that the City failed to provide a similar increase to the Union's members, thereby violating the parity provision in effect at the time the City and police officers' union entered into the 2002 PBA Memo. The City's Human Resources Director, Christine Jensen (Jensen), denied the grievance on October 17, 2007, and the Union pursued its claim through arbitration.

In defending the grievance, the City argued that the Union's grievance was untimely because the Union failed to file the grievance within five days of the date of the PBA Memo, as required under the terms of CBA 2, which was the CBA in effect at the time the Union filed the grievance. The arbitrator found in favor of the Union. In his Award decision, the arbitrator first recited the language of Article 20 of CBA 2 (effective January 1, 2004, on-

---

1. Act of June 24, 1968, P.L. 237, *as amended*, 43 P.S. §§ 217.1–.10. Generally, Act 111 applies to the resolution of (1) collective bargaining disputes between unionized firefighters and police officers and their municipalities, and (2) grievances initiated by firefighters and police officers.

ward). Section 1 of Article 20 was unchanged from CBA 1 and provided:

Section 1. Any increase in salary which is granted during the term of this contract to any employee of the Police Department which is greater than that received by any employee of the bargaining unit, who is in a classification which had the same salary range as the classification of such Police Department employee during the 1967–1968 fiscal year, and who has the same length of service in his classification ... shall be simultaneously effective for such employee of the bargaining unit, and shall be in addition to the provisions of this contract. For purpose of this section, the term "increase in salary" shall mean and include any increase in annual salary, any provision or for any increase in longevity pay, or any increase in insurance or pension benefit.

(R.R. 26a.) CBA 2, however, also included the following sentence in *amended* Section 2: "Parity with Police Department employees in health insurance and wages for all bargaining unit members shall be waived for the period January 1, 2004 through and including December 31, 2010."

The arbitrator also observed the details of the PBA Memo, which provided, *inter alia,* for payments of $1,300 for each member on October 15, 2002, and January 15, 2003, and for *annual* payments of $1,500 to each member every January 15 beginning on January 15, 2004.

Before addressing the merits of the grievance, the arbitrator first considered the City's contention that the Union's grievance was untimely. Pertinent to that question was the testimony of Thomas Makar (Makar), the President of the Union. Makar testified that a neighbor who was a retired police officer gave him a number of papers in which he thought Makar might be interested. Makar stated that he found the PBA Memo among those papers, and that, upon investigation, he determined that the City, in its budget, had identified the payments made pursuant to the PBA Memo as being part of the police officers' salary.

The arbitrator found that the Union's delay in filing the grievance was not grounds to dismiss the grievance because the Union filed the grievance shortly after it first became aware of the PBA Memo. The arbitrator believed Makar's description of how he learned of the PBA Memo and its ramifications, and reasoned that he filed the grievance within a day or two of reading the PBA Memo, thereby complying with the five-day filing requirement.

As to the second issue, the arbitrator concluded that the parties did not intend that the new language of Article 20, Section 2 (the parity waiver) would allow the City to avoid violations that occurred before the effective date of CBA 2 if the Union had no reason to know of the pre–2004 violations. The arbitrator concluded that the annual payments to the police officers under the PBA Memo constituted increases in salary. With regard to the new language of Section 2, the arbitrator opined that this provision was a waiver of parity of wages for the period after 2004, but not with regard to the increase under the Memo that remained undiscovered until Makar read the Memo.

Ultimately, the arbitrator entered an award that provided the following relief: (1) increase the Union members' annual wages by $1,500; (2) pay all current and retired members for the increases that occurred in 2002, 2003, 2004 and each year thereafter; and (3) adjust the pensions of retired Union members based upon the increases due.

On October 14, 2008, the City filed a petition to review arbitration opinion and

award with the trial court. Pertinent to the appeal to this Court is the assertion the City made to the trial court that a letter dated February 23, 2004 (Letter), written by Makar to Jensen (the City's Human Resources Director), which Jensen discovered after the arbitration proceedings, suggested that Makar's testimony in the arbitration regarding the timing and circumstances surrounding his knowledge of the PBA Memo was false. At paragraph 32 of its filing with the trial court, the City averred that the letter from Makar included the following statement:

> The only good thing that resulted from the hearing [or negotiations regarding what ultimately became CBA 2] was the exposure of the generous deals that the City Administration gave to the Police PBA. Specifically the contract extensions and raises given to the PBA without any significant Give Backs. Also came to light were the $1300, $1400, and $1500 given to the Police for mandatory educational requirements.

(R.R. 16a, 216a.) The City averred that the Letter indicates that, contrary to Makar's testimony, the Union did know about the Memo as early as 2004, but that Jensen did not recall the substance of the Letter until after the arbitration hearing had concluded. The City also averred that J.J. Murphy (Murphy), who is the City's current City Administrator, was in active military service at the time of the arbitration proceedings. The City contends that Murphy, following a conversation with the City's Mayor in September 2008, remembered that, during the 2004 negotiations, the Union specifically requested that they receive raises equivalent to the payments made to police officers under the PBA Memo. He relayed this information to Jensen, who then reviewed the City's files and discovered the Letter from Makar.

In its appeal to the trial court, the City acknowledged that a trial court's scope of review of an Act 111 arbitration award is limited to four areas: (1) the jurisdiction of the arbitrator, (2) the regularity of the proceedings, (3) excess in the exercise of power by an arbitrator, and (4) deprivation of constitutional rights. *Pennsylvania State Police v. Pennsylvania State Troopers' Ass'n (Betancourt)*, 540 Pa. 66, 656 A.2d 83 (1995). This scope of review is called narrow certiorari. *Id.* The City asserted that the trial court could engage in a review of the arbitrator's award, contending that, because of the alleged misrepresentations of Makar, the arbitration proceedings were irregular. In response to the City's assertions, the Union claimed that the law did not permit the trial court to consider the Letter (and another post-arbitration hearing document suggesting that Makar had not testified truthfully before the arbitrator) because the Letter (and document) was not a part of the record made before the arbitrator. Thereafter, the City filed with the trial court a motion for leave to introduce evidence and conduct discovery (Motion) in the form of a rule to show cause.

By order dated March 9, 2009, the trial court denied the City's Motion, noting, at the outset, that the parties agreed that no appellate decision had yet addressed the question of whether evidence discovered after the issuance of a grievance arbitration award is admissible before a reviewing court evaluating the regularity of proceedings in an Act 111 grievance arbitration matter. The trial court considered the question of whether allowing the submission of newly discovered evidence really was different from permitting an improper de novo review of the evidence. In other words, as the Union claimed, the trial court considered whether permitting the introduction of the new evidence as an "irregularity" in the arbitration proceeding

would merely be a crafty means to try to challenge the credibility of a witness on appeal. The trial court relied primarily upon this Court's decision in *Borough of Montoursville v. Montoursville Police Bargaining Unit*, 958 A.2d 1084 (Pa. Cmwlth.2008). The trial court concluded that the City's claim implicated the arbitrator's fact-finding responsibilities, and that, consequently, the court had to apply extreme deference to the award. The trial court opined that the City was trying to achieve a result in the review stage that it could have or should have accomplished before the arbitrator.

On May 12, 2009, the trial court issued an order on the merits of the appeal, affirming the arbitrator's Award. The trial court concluded that the arbitrator acted within his jurisdiction, there were no irregularities in the proceedings, the arbitrator did not exceed his powers, and the proceedings violated neither party's constitutional rights (the narrow certiorari standards). The City appealed to this Court.

On appeal,[2] the only question the City raises is whether the trial court erred in refusing to allow the City to introduce the post-hearing discovered evidence regarding Makar's knowledge of the PBA Memo, or to remand to the arbitrator to accept such evidence, which appears to contradict Makar's sworn testimony before the arbitrator.[3]

The City's primary argument is that the trial court erred in concluding that, under the narrow certiorari scope of review, it could not conduct a hearing to accept the Letter into evidence in order to evaluate the question of whether the proceedings before the arbitrator were "regular." The sole basis upon which the City relies in making this argument is its contention that Makar's alleged misrepresentation rendered the arbitration proceedings irregular.

The City contends that, contrary to the trial court's conclusion, a party on appeal may, by way of introducing evidence before the reviewing trial court, establish that an irregularity occurred in an Act 111 arbitration proceeding, and thus secure reversal of an adverse arbitration award by proving that a material witness lied or misrepresented a fact that was necessary to the issuance of the award. The City, however, relies on cases that have been decided by the Pennsylvania Superior Court arising outside the context of Act 111 and the narrow certiorari scope of review, primarily *McKenna v. Sosso*, 745 A.2d 1 (Pa.Super.1999), *allocator denied*, 563 Pa. 677, 759 A.2d 924 (2000), and *Paugh v. Nationwide Insurance Company*, 278 Pa.Super. 108, 420 A.2d 452 (1980).

*Paugh* is a case that presents facts and an outcome that would favor the City's position, *but for* the fact that it did not arise under Act 111's narrow certiorari scope of review. In that case, Joyce Paugh was a passenger in a car being driven by her sister, Carolyn Rusidoff,

---

2. This Court's standard of review of a trial court order denying a petition to review an arbitrator's award under Act 111 is plenary where the issue involved is purely a question of law. *Borough of Montoursville.* In this case, although the issue relates to a factual question, *i.e.*, Makar's alleged misrepresentation, the question before the Court is one of law: whether discovery after the issuance of the arbitrator's award of information that bears on the credibility of a witness whose

testimony was key to the arbitrator's decision warrants the acceptance by the trial court, or remand to the arbitrator for that purpose, of the evidence.

3. Additionally, the Union suggests that the City has waived any issues relating to the merits by failing to raise challenges to the trial court's conclusions on the merits in its brief.

when a truck proceeding in the opposite direction hit a deer and propelled the deer through the windshield of Rusidoff's car and through the rear of the car. The deer struck Paugh causing her death. Paugh's husband initiated a wrongful death action against a trucking company, DeBolt Transfer, Inc., alleging that one of its drivers hit the deer that caused Paugh's death. A jury returned verdicts in favor of DeBolt. The Superior Court on appeal, however, ordered a new trial on the complaint.

After the jury verdict, but before the Superior Court resolved the appeal, Paugh's husband pursued potential recourse against Rusidoff's insurance company, Nationwide Insurance, based upon a clause in Rusidoff's insurance policy that defined an uninsured automobile as one for which identity cannot be established, and provided for recovery from Nationwide in such circumstances. This action, in accordance with the insurance policy, proceeded to common law arbitration, and during a hearing before an arbitration panel, Rusidoff testified that she did not know the name of the responsible trucking company. The arbitration panel awarded Paugh damages. Nationwide ultimately learned of the civil action against DeBolt and filed a petition to set aside the award based upon the inconsistency demonstrated with regard to Paugh's testimony before the arbitration panel. The trial court concluded that Nationwide had simply failed to refute the testimony in favor of Paugh's insurance claim, and that even if Nationwide had known about the lawsuit, the arbitrators might have still ruled in favor of Paugh. The Superior Court reversed, agreeing with Nationwide's argument that Paugh's failure to disclose the information led to an unjust award.

The Superior Court first noted that a common law "arbitration award may be set aside for fraud, corruption or similar irreg-

ularity leading to an unjust, inequitable or unconscionable award." *Id.,* 420 A.2d at 457–8. The Superior Court quoted *Allstate v. Fioravanti,* 451 Pa. 108, 116, 299 A.2d 585, 589 (1973), wherein our Supreme Court commented that an award may reflect such a degree of bad faith or indifference to the fairness of a result that such conduct could fall within the meaning of the term "irregularity," the "most definitionally elastic of the grounds for vacatur." *Paugh,* 420 A.2d at 458.

While acknowledging that previous decisions had found irregularities to have occurred only with regard to the actions of arbitrators, the Superior Court opined that an award may be sufficiently unjust because of actions of a claimant, and that the case presented just such circumstances. The court also disagreed with the trial court's reasoning that Nationwide could have, but failed to refute Paugh's misrepresentation: "The point is that Nationwide did not know, and that [Paugh] did know, that there was reason to believe that the driver was not unidentified, and that nevertheless [Paugh's] claim was presented to the arbitrators as though the driver was unidentified." *Id.,* 420 A.2d at 459.

The remaining cases upon which the City relies, none of which involve *narrow certiorari* review, to a lesser degree than *Paugh* suggest situations in which a party seeking to challenge an arbitration award may present evidence to a trial court.

The Union contends, and we agree, that the non-Act 111 decisions upon which the City relies were decided by application of a scope of review permitting examination of areas not contemplated under the narrow certiorari review applicable under Act 111. In this regard, the Union refers us to *Polis v. Raphael,* 160 Pa.Super. 544, 52 A.2d 355 (1947), and *Ristau v. Crew Levick Co.,* 109 Pa.Super. 357, 167 A. 800 (1933), for the proposition that courts should make every

presumption in favor of regularity so long as such presumptions are consistent with the record made before the arbitrator. These cases, which pre-date Act 111 and *Betancourt,* reveal that only questions such as (1) whether there actually were proceedings, (2) whether the parties had notice of the proceedings, and (3) whether the process of the entity or individual conducting the proceedings was regular, subject an award to review for "regularity" challenges.

The Union contends that narrow certiorari permits an examination of only the record in considering whether the proceedings were regular. Further, policy underlying labor disputes involving police and fire fighters favors prompt and swift proceedings, and if the Courts adopt the City's perspective, the result could mean that parties will seek to re-litigate matters and, perhaps deliberately, create such evidentiary issues through similar allegations of after-discovered evidence, purposefully for delay.

The Union points out that our Supreme Court in *Betancourt* expressly rejected for Act 111 cases another broader scope of review—*i.e.,* the essence test—which provides a reviewing court with the power to consider whether an arbitrator's award represents a reasonable interpretation of a collective bargaining agreement. Similarly, it argues that the respective scopes of review applicable in common law arbitration cases and under the Uniform Arbitration Act[4] are broader than the narrow certiorari scope of review applicable in Act 111 cases. Thus, the Union argues that, by accepting the City's argument, this Court would be improperly broadening the Supreme Court's limitation of areas reviewable under the narrow certiorari scope of review.

We find support for the Union's position in *City of Philadelphia v. Fraternal Order of Police Lodge No.5 (Jason Breary),* —— Pa. ——, 985 A.2d 1259 (2009) *(Breary),* where our Supreme Court considered an order of this Court, vacating and remanding a trial court order denying the city's petition to vacate an arbitration award. Our Supreme Court concluded that the award violated the city's procedural due process rights when the arbitrator precluded the city from submitting defense evidence after it inadvertently failed to comply with a subpoena. In discussing the scope of review, the Supreme Court reiterated the reasoning contained in *Town of McCandless v. McCandless Police Officers Association,* 587 Pa. 525, 540, 901 A.2d 991, 1000 (2006): "Generally speaking, a plenary standard of review should govern the preliminary determination of whether the issue involved implicates one of the four areas of inquiry encompassed by narrow certiorari, thus allowing for non-deferential review." The Supreme Court stated: "We are bound, however, by all determinations of fact and issues of law not encompassed by the standard of narrow certiorari, even if incorrect." *Breary,* 985 A.2d at 1266. For the reasons that follow, we conclude that the City's claim does not implicate the regularity prong of our *narrow certiorari* scope of review.

We see similarities between the City's request to the trial court and requests of litigants seeking new trials based upon after-discovered evidence. In the latter situation, this Court has noted that a trial court should grant such relief only where the "evidence: (1) is new; (2) could not have been obtained at trial in the exercise of due diligence; (3) is relevant and non-cumulative; (4) is not for the purposes of impeachment; [and] (5) ... must be likely to compel a different result." *In the Mat-*

4. 42 Pa.C.S. §§ 7301—7320.

*ter of Condemnation by Indiana Twp.*, 107 Pa.Cmwlth. 207, 527 A.2d 1115, 1116 (1987). That case involved an assertion by a township that the opposing party's expert witness, who had testified regarding the valuation of property for eminent domain condemnation purposes, had perjured himself regarding his qualifications.

Based upon these criteria, the evidence the City seeks to introduce would not support the grant of a new trial. The evidence is not "new" and the City had the Letter in its possession. If the City had acted with reasonable diligence it could have produced the Letter during the arbitrator's hearing. Further, the obvious purpose of seeking to have the Letter admitted is to impeach the testimony of Makar.

In *Commonwealth v. Stern*, 509 Pa. 260, 501 A.2d 1380 (1985), the Supreme Court reversed a trial court's decision to grant a new trial based upon a plaintiff's request to have the trial court consider after-discovered evidence. The plaintiff in that case had filed an action against the defendant seeking to establish that the defendant was the father of her child. During the trial, the defendant denied having had sexual relations with the plaintiff, and ultimately, a jury returned a verdict in favor of the defendant. At a hearing on the request for a new trial, the plaintiff and a friend of hers testified regarding a telephone conversation between plaintiff and defendant during which the defendant suggested that he was the father of the child. The Superior Court affirmed the trial court's granting of a new trial, and the defendant appealed to the Supreme Court.

With regard to the nature of the evidence the plaintiff sought to introduce, the Supreme Court opined that the "only inherent quality is for impeachment purposes." *Id.*, 509 Pa. at 265, 501 A.2d at 1382. The Supreme Court then observed that after-discovered evidence offered to impeach the credibility of a witness constitutes insufficient grounds upon which to grant a new trial. The Court noted, however, that a distinction exists that may warrant a new trial where a witness *admits* after trial that he or she did lie. The Supreme Court stated: "Under the facts before us we need not determine what other proofs, short of a conviction or a confession of perjury, would justify [the grant of a new trial]." *Id.*, 509 Pa. at 266, 501 A.2d at 1383.[5]

These cases, therefore, stand for the proposition that, barring some admission by a witness to the effect that they did, indeed, perjure themselves, the doctrine of after-discovered evidence does not apply even to instances of perjury, because the purpose of such evidence is for impeachment. Similarly, in this case, and in accordance with the above-noted decisions, if this matter had been one before a trial court, the court could not permit a new trial based upon the characterization of the Letter as after-discovered evidence. This case is not, however, a typical appeal from a trial court adjudication, but rather an appeal involving narrow certiorari review,

---

5. *See also Weissbach v. Price*, 328 Pa. 46, 195 A. 21 (1937) (noting authority suggesting evidence of perjury warrants new trial not applicable because evidence at issue was not in possession of defendant before conclusion of trial). Also noteworthy is our Supreme Court's decision in *Limper v. Philadelphia Electric Company*, 297 Pa. 204, 146 A. 574 (1929), in which our Supreme Court concluded that the defendant was not entitled to a new trial based upon after-discovered evidence suggesting that the plaintiff had committed perjury. Although the Supreme Court based its rejection on the fact that the record refuted the allegation of perjury, it also noted that the company had an opportunity to obtain the evidence before the trial if it had made a reasonable investigation.

and, consequently, our ability to review such allegations is even more circumspect.

We do note that this Court in *Condemnation by Indiana Township* also referenced cases involving fraud perpetrated upon a trial court based upon allegations of after-discovered perjured testimony. These cases, however, all depended on either an admission by a witness that he committed perjury or subsequent under-oath testimony contradicting the earlier sworn testimony. *Kvaternik v. Yochim,* 360 Pa. 387, 61 A.2d 815 (1948). Further, an early leading case cited by many decisions in this area, *McEvoy v. Quaker City Cab Company,* 267 Pa. 527, 110 A. 366 (1920), related the distinction between intrinsic and extrinsic fraud. The Court concluded that only evidence of extrinsic fraud supported the granting of a new trial based upon fraud. Extrinsic fraud, the Court opined, related to actions that prevented a losing party from presenting his case. Fraud is intrinsic and, therefore, an insufficient basis to grant a new trial, where the party had an opportunity to expose the alleged fraud at trial.

In this case, any allegations of fraud based upon perjury would not constitute an extrinsic fraud because the Letter was evidence that the City had in its possession. The City, with adequate diligence, could have produced the Letter at the arbitrator's hearing in order to refute Makar's testimony regarding the date upon which he learned of the PBA Memo.[6]

■ These observations arising from after-discovered evidence and fraud cases do not control our decision, but they do inform it. In the context of after-discovered evidence, such evidence as the City seeks to have a reviewing body consider in analyzing the question of whether the proceedings were regular, would not have warranted the grant of a new trial. Narrow certiorari review, unlike the scope of review applicable in common law arbitration, does not specifically encompass fraud as an area for review.

■ We cannot agree with the City that the evidence it sought to introduce implicates the "regularity" of the proceedings before the Arbitrator, and, consequently, the proffered evidence presents no mandate to direct the trial court to consider accepting the evidence. Even if the trial court were to have admitted the Letter, the City would not have been entitled to the additional relief it requested—a review for irregularity. In this Court's view, the City is essentially asking for a second bite of the evidentiary apple—*i.e.,* another opportunity to impeach a witness's testimony. The City does not complain that any party foreclosed access to or withheld the Letter. The Letter was in the City's possession long before the Union filed its grievance. The City offers no suggestion

---

**6.** We also note the arbitrator's comments regarding Makar's testimony. The arbitrator states in his Award that Makar testified that he first learned about the PBA Memo when he read through his neighbor's papers and then he discovered that the City budget referred to the increases as part of police officers' *salary.* The parity provision applies only to increases in salary. Hence, a fact finder could evaluate the hearing evidence and the existence of the PBA Memo to mean that (1) Makar knew about certain increases, but did not know about the Memo, and (2) did not connect the increases about which he may have known in 2004 to the term *salary* such as to provide the Union with notice that the members of the police force had received an increase in *salary.* Consequently, there may be a reasonable explanation for the disparity, such that an adjudicator reviewing the evidence might not consider the testimony to be perjury, but rather an oversight, and might conclude that the evidence the City sought to have introduced and considered would not have necessarily affected the outcome.

why the courts should afford the City, as a litigant, special treatment and opportunities that litigants in any other types of litigation never have. Here, the City essentially is asking to do now what it could have and should have done before the arbitrator. A party seeking to ensure that truth favoring his position comes out in a hearing bears a responsibility to complete a record at the time of a hearing. We cannot here conclude that a party is entitled to seek to challenge a witness's credibility with evidence in its possession about which it forgot and remembered after the completion of a hearing, and as in this case, after the issuance of an adjudication. A party's failure to remember evidence that might have aided its case by challenging a witness's credibility simply does not amount to an irregularity of proceedings.

While we cannot close the door on the possibility that some dispute in the future may provide a clear basis for permitting a trial court to accept evidence to evaluate a case under narrow certiorari review, the City has not asserted facts here that suggest the evidentiary issue it presents implicates the regularity of the proceedings under Act 111. Accordingly, we affirm the trial court's order denying the City's petition to review the arbitrator's award.

### ORDER

AND NOW, this 22nd day of March, 2010, the order of the Court of Common Pleas of Luzerne County is affirmed.